Filed 3/28/23  In re L.L. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re L.L., A Person Coming Under the Juvenile Court Law. | B318779, B320802 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LISA L.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP06654A) |

APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge. Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

Lisa L. (Mother) appeals from the juvenile court's January 18, 2022 order denying her Welfare and Institutions Code section 388[1] petition without a hearing. Through the petition, Mother sought custody of her then four-year-old daughter, L.L., or alternatively, six additional months of reunification services and liberalized visitation. Mother contends that the court erred in summarily denying her petition because she made a prima facie showing of changed circumstances, including her enrollment in a residential substance abuse treatment program, and that the proposed order would be in L.L.'s best interests. Mother contends further that the Department of Children and Family Services (DCFS) and the juvenile court failed to discharge their respective initial inquiry duties under California law implementing the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.), and that these failures require reversal of the court's finding that ICWA does not apply in this case. Specifically, Mother argues that DCFS failed to interview available extended family members concerning L.L.'s heritage, and that the court failed to instruct the parties on the record that they must disclose any subsequently obtained information relevant to the ICWA inquiry.

Mother also appeals the juvenile court's March 22, 2022 orders appointing paternal grandmother and paternal great-grandmother as L.L.'s legal guardians and terminating dependency jurisdiction, relying exclusively on her claims concerning the section 388 petition and alleged ICWA errors as grounds for reversal.

We agree that Mother has made laudable progress in alleviating the concerns that gave rise to this case. The record

---

[1] Unless otherwise specified, subsequent statutory references are to the Welfare & Institutions Code.

discloses, however, that much of that progress occurred after the juvenile court denied Mother's section 388 petition. Mother is free to file a new petition detailing her additional progress, but we cannot conclude that the court abused its discretion in summarily denying the January 2022 petition on the then-existing record. We conclude further that the ICWA inquiry errors alleged here were harmless. Accordingly, we affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL SUMMARY[2]

### A. *Overview*

On October 10, 2018, law enforcement arrested Mother for walking in the middle of traffic backwards while holding then 10-month-old L.L. The officers hospitalized Mother pursuant to section 5150[3] and placed L.L. in the care of her father, C.W. (Father). On October 16, 2018, DCFS filed a section 300 petition concerning L.L. alleging that Mother's "mental and emotional problems"—which included a diagnosis of schizoaffective and bipolar disorders—and her purported abuse of marijuana and benzodiazepine placed L.L. at risk of serious

---

[2] We limit our summary to the facts and procedural history relevant to the issues Mother raises on appeal. Father is not a party to this appeal, and we therefore discuss his involvement in the dependency proceedings only to the extent relevant to Mother's claims.

[3] Section 5150 authorizes law enforcement to take into custody for up to 72 hours "a person [who], as a result of a mental health disorder, is a danger to others, or to themselves." (§ 5150.) Law enforcement previously had placed Mother on a section 5150 hold on September 26, 2018, because she had "active suicidal thoughts." The hospital prescribed Mother medication and discharged her on October 8, 2018, two days prior to the October 10, 2018 incident.

physical harm.  The following day, the juvenile court held a detention hearing at which it ordered L.L. to remain in Father's care and granted Mother monitored visitation.

At the subsequent December 6, 2018 jurisdiction hearing, the court dismissed the petition's allegations concerning Mother's drug abuse, but sustained the allegations concerning Mother's mental health issues.  The court also issued a case plan for Mother requiring that she participate in parenting education, individual counseling, and a psychiatric evaluation; take all prescribed psychotropic medication; and submit to 10 random drug tests, with a full treatment program upon a missed or positive test.[4]

On March 29, 2019, the juvenile court authorized L.L.'s removal from Father, in response to allegations that he was abusing marijuana and had permitted Mother to have unmonitored contact with L.L.  On April 2, 2019, DCFS filed a supplemental petition pursuant to section 387 on the basis of these allegations.  At the subsequent April 3, 2019 hearing, the juvenile court approved DCFS's placement of L.L. in the care of paternal grandmother and paternal great-grandmother.  L.L. remained in that placement throughout the ensuing dependency proceedings.

At the November 5, 2019 six-month status review hearing, the juvenile court found that Mother had not made substantial progress with her case plan.  Although Mother had enrolled in an outpatient substance abuse program, she attended only sporadically and continued using marijuana.  She was not consistent in submitting to random drug testing.  In addition, Mother had failed to participate in individual counseling for the month leading up to

---

[4] Although the juvenile court reissued Mother's December 6, 2018 case plan on May 14, 2019, the court did not materially alter the plan's terms.

the hearing, and Mother's therapist reported that she did not appear to be making progress in her treatment goals. Finally, notwithstanding Mother's completion of a parenting class and her twice-weekly visits with L.L., Mother told DCFS that "she was not ready for [L.L.] to return to her care because [she was] 'tired.' " The juvenile court therefore ordered further reunification services and set the 12-month review hearing for May 5, 2020. Due in part to the Covid-19 pandemic, the court continued the 12-month review hearing to December 8, 2020.

At the December 8 hearing, the juvenile court again found that Mother's compliance with her case plan "ha[d] been below adequate." Since the six-month status review, Mother had demonstrated improved consistency in participating in mental health services and increased motivation to comply with her medication regimen; however, she sometimes forgot to take her prescriptions. Mother reliably participated in outpatient substance abuse counseling sessions, but she did not comply consistently with the drug testing portion of the program. And although Mother continued to visit L.L., she did so less frequently— visiting only once per week, rather than the four times per week permitted—and did not always appear for scheduled visits. The court therefore concluded that it "[did not] think that [there was] a likely date [by] which the child may be returned and safely maintained in the family home," and ordered that L.L. "continue in the out-of-home placement" with paternal grandmother and paternal great-grandmother. The court then terminated reunification services and set a section 366.26 hearing for March 30, 2021. The court subsequently continued the section 366.26 hearing several times due to changes in L.L.'s recommended permanent plan, finally scheduling the hearing for March 2, 2022.

On December 1, 2021, approximately four months prior to the scheduled March 2, 2022 section 366.26 hearing, Mother entered residential substance abuse treatment. Due to the Covid-19 pandemic, the program limited Mother's visitation with L.L. to video chat. Mother participated in 15-minute video visits with L.L. four times during the week and occasionally on weekends. DCFS reported that the visits went well.

On January 11, 2022—while living at the residential treatment center—Mother filed a section 388 petition requesting that the juvenile court either return L.L. to Mother's care or grant six additional months of reunification services, along with liberalized visitation. In support of her requests, Mother argued that her circumstances had changed because "[i]n addition to previously completing a parenting program . . . , [she] ha[d] been receiving mental health treatment . . . , outpatient substance use treatment . . . since 5/22/2020 . . . , and subsequently enrolled in an inpatient treatment program." Mother argued further that she "ha[d] been able to decrease her depressive symptoms with utilizing coping skills over the past year[,] . . . ha[d] made progress in treatment[,] and [had] obtain[ed] employment on her own." Mother also noted that her "marijuana use ha[d] decreased consistently." Finally, Mother asserted that her history of successful once-a-week visits with L.L. demonstrated that the requested relief would be in the child's best interests.

On January 18, 2022, the juvenile court denied the petition, concluding that Mother had failed to make a prima facie showing of changed circumstances or that the proposed order would be in L.L.'s best interests.

Between the January 18 denial of her petition and the scheduled March 2 section 366.26 hearing, Mother completed 60 days of residential substance abuse treatment. Following her

release from the treatment facility on January 29, 2022, Mother began visiting L.L. Monday through Friday for three hours in the evening. DCFS reported that the visits went well: Mother would take L.L. to the park, help L.L. with homework, or do arts and crafts projects with L.L.

At the March 2, 2022 hearing, Mother introduced six exhibits reflecting, inter alia, her completion of residential substance abuse treatment, as well as her substantial volunteer service and positive participation as an "elder" in the residential program. The juvenile court determined that it could not order a permanent plan for L.L. at the hearing because the materials submitted by DCFS did not adequately document the caregivers' recent decision to pursue legal guardianship of L.L., rather than adoption.[5] The court therefore continued the section 366.26 hearing to March 22, 2022. The court did, however, grant in part Mother's request to allow her unmonitored visits with L.L., permitting two of Mother's four weekly visits to proceed unmonitored.

On March 22, 2022, the juvenile court held the continued section 366.26 hearing. Mother objected orally to DCFS's proposed plan of legal guardianship. She also requested that, if the court nonetheless granted guardianship, she be permitted to conduct all visits with L.L. unmonitored and be granted overnight visits. Mother did not, however, file a new section 388 petition in advance of the hearing. The juvenile court granted legal guardianship of

---

[5] The record discloses that paternal grandmother and paternal great-grandmother vacillated between pursuing adoption and legal guardianship. They explained that, originally, they believed they must pursue adoption to prevent another family from adopting L.L. Their ultimate preference, however, was to pursue legal guardianship to allow Mother and Father the possibility of reunifying with L.L. in the future.

7

L.L. to paternal grandmother and paternal great-grandmother. It also granted Mother's request for unmonitored visits and granted discretion to L.L.'s legal guardians to permit overnight visits. Finally, the court terminated dependency jurisdiction over L.L.

## B. *ICWA Proceedings*

Throughout the underlying dependency proceedings, Mother and Father represented repeatedly that they have no Native American Indian heritage. The ICWA Child Inquiry Attachment (Judicial Council Forms, form ICWA-010(A) (ICWA-010(A) form)) appended to the October 16, 2018 section 300 petition reflects that a DCFS social worker interviewed Father and Mother prior to the petition's filing, and that both parents "denied ICWA" in those interviews.

In addition, both parents submitted parental notification of Indian status forms in which they checked the box indicating that they "have no Indian ancestry as far as [they] know" (Judicial Council Forms, form ICWA-020). The juvenile court also confirmed on the record during the October 17, 2018 detention hearing—at which both Mother and Father appeared—that "both parents indicate no Native American ancestry."

Based on this information, the juvenile court determined that it "[did] not have a reason to know" that L.L. was "an Indian [c]hild, as defined under ICWA, and [did] not order notice to any tribe or the [Bureau of Indian Affairs]." The court's October 17, 2018 minute order directed the parents "to keep [DCFS], their [a]ttorney[s,] and the [c]ourt aware of any new information relating to possible ICWA status." The court did not, however, inform the parents orally during the October 17 hearing of the requirement to provide updated ICWA information.

On April 2, 2019, in connection with preparation of its supplemental section 387 petition, DCFS again interviewed Father concerning any known Indian ancestry. The ICWA-010(A) form appended to the supplemental petition reflects that, during the interview, Father reiterated his prior representation that L.L. "has no known Indian ancestry." And on December 8, 2020, the juvenile court confirmed its prior finding that there was no reason to know that L.L. was an Indian child, as defined under ICWA.

Finally, the record reflects that, over the course of the dependency proceedings, DCFS had contact with extended maternal and paternal relatives, including paternal grandmother, paternal great-grandmother, paternal grandfather, maternal grandmother, maternal aunt, and maternal uncle. DCFS concedes that it did not interview these relatives concerning L.L.'s heritage.

### C. *Notices of Appeal*

Mother timely appealed the juvenile court's January 18, 2022 denial of her section 388 petition, as well as the court's March 22, 2022 orders appointing legal guardians for L.L. and terminating dependency jurisdiction. We consolidated the appeals for purposes of argument and decision.[6]

---

[6] In its respondent's brief filed prior to the consolidation, DCFS argues that Mother's purported failure to appeal the March 22, 2022 orders rendered moot the remainder of her appeal. DCFS now appears to recognize that Mother did appeal the March 22 orders, and it omits the mootness argument from its post-consolidation respondent's brief. To avoid any doubt, we note that Mother's appeals are not moot. We can provide Mother effective relief by (1) reversing the January 18 and March 22 orders, and (2) directing the juvenile court to hold a hearing on the section 388 petition, to order further ICWA compliance, or

9

## DISCUSSION

Mother contends that we must reverse the juvenile court's March 22, 2022 orders appointing legal guardians for L.L. and terminating dependency jurisdiction because (1) the court erred in denying her section 388 petition without a hearing, and (2) DCFS and the court failed to discharge their respective ICWA initial inquiry duties. Mother contends further that, in light of these errors, we must reverse the court's January 18, 2022 order denying the section 388 petition and remand the matter for ICWA compliance.

We review the court's summary denial of the section 388 petition for abuse of discretion (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460), and because the material facts are undisputed, " ' "we review independently whether ICWA requirements have been satisfied." ' [Citation.]" (*In re J.K.* (2022) 83 Cal.App.5th 498, 504.)

### A. *The Juvenile Court Acted Within Its Discretion When It Summarily Denied Mother's Section 388 Petition*

Mother contends that the court abused its discretion by denying her section 388 petition without a hearing. We disagree.

Section 388 allows a parent or other person with an interest in a dependent child to petition the court for a hearing to change, modify, or set aside any previous order on the grounds of change of circumstance or new evidence. (§ 388.) The petition "shall set forth in concise language any change of circumstance or new evidence

---

both. (See, e.g., *In re D.P.* (2023) 14 Cal.5th 266, 277 ["[A] case is not moot where a court can provide the plaintiff with ' "effective relief." ' [Citation.] In this context, relief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' "].)

that is alleged to require the change of order or termination of jurisdiction." (*Ibid.*)

The parent seeking modification must " 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]' [Citations.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) This showing has two prongs: A parent must demonstrate (1) a genuine change of circumstances or new evidence, and (2) that revocation of the prior order would be in the best interests of the child. (*Ibid.*) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the [requested] hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

Mother failed to make the necessary showing. With respect to the first prong, the record as a whole reflects that Mother was in the process of changing at the time the court denied her petition, not that she had *completed* a significant change. (See *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 ["the [section 388] petitioner must show changed, not changing, circumstances," italics omitted].) Although Mother had obtained employment and demonstrated improved consistency in managing her mental health, she had entered residential substance abuse treatment only six weeks prior to filing her petition and had not yet completed the program. Mother's laudable progress thus reflected changing, rather than changed, circumstances—a fact that distinguishes her case from the authorities on which she relies. (See *In re N.F.* (2021) 68 Cal.App.5th 112, 119 [affirming juvenile court's decision to conduct section 388 hearing, but ultimately to deny the petition, where petitioner had completed a 90-day residential treatment program five months prior to filing the petition]; *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 [reversing denial of section 388 petition without a hearing because, inter alia, petitioner had tested

11

clean in weekly random drug tests for over two years prior to filing the petition].)

As to the second prong, Mother relies solely on her once-a-week, in-person visits with L.L. as evidence that her request would be in the child's best interests. But earlier in the dependency proceedings, Mother had been visiting L.L. twice per week. Mother's petition therefore reflected a decrease in visitation, rather than progress in working toward the four visits per week permitted by Mother's case plan. And Mother's enrollment in residential substance abuse treatment—which we reiterate was commendable—restricted her ability to visit L.L. in person. Moreover, Mother's petition fails to address any of the remaining considerations relevant to the "best interests" inquiry, including "the seriousness of the reason for the dependency in the first place" (see *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530) and the "length of time [L.L.] has been in the dependency system in relationship to the parental bond." (See *id.* at p. 531.) These factors counsel against granting Mother's petition: DCFS filed this case because of a serious safety issue; L.L. was only 10 months old when DCFS initiated the proceedings in October 2018; and since March 2019, L.L. has resided with paternal grandmother and paternal great-grandmother.

On appeal, Mother argues that, following the court's denial of her petition, she made further significant progress in achieving sobriety and in building a strong bond with L.L. She points to, inter alia, her completion of residential substance abuse treatment and her successful unmonitored visits with L.L. We agree that the record reflects laudable progress by Mother. In general, however, we review the correctness of an order as of the time it was made. (See *In re Josiah Z.* (2005) 36 Cal.4th 664, 676 ["an appellate court should not consider postjudgment evidence

going to the merits of an appeal and introduced for the purposes of attacking the trial court's judgment"]; *In re Zeth S.* (2003) 31 Cal.4th 396, 405.)  And although Mother argued at the section 366.26 hearing that the court should return L.L. to her custody, Mother did not file an updated section 388 petition describing the additional changed circumstances.  (See *In re Caden C.* (2021) 11 Cal.5th 614, 630 [contrasting section 388, which permits the return of a child to a parent's custody, with "the section 366.26 hearing, [at which] the question before the court is decidedly not whether the parent may resume custody of the child"].)

We therefore agree with DCFS that, should Mother wish to challenge the legal guardianship order on the basis of evidence postdating her original petition, she may file a new section 388 petition.  (See *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1210 [concluding that "a legal guardianship can be terminated by a parent under section 388"].)

Accordingly, we conclude that the juvenile court did not abuse its discretion in denying Mother's section 388 petition on the record then before it.

## B.    *The ICWA Inquiry Errors Were Harmless*

Mother contends that DCFS failed to interview available extended family members concerning L.L.'s heritage, as required by California law implementing ICWA.  (See § 224.2, subds. (a) & (b); Cal. Rules of Court, rule 5.481 (a)(1) [when DCFS seeks a guardianship or preadoptive placement, it "must ask the child, if the child is old enough, and the parents, . . . extended family members, [and] others who have an interest in the child . . . whether the child is or may be an Indian child"].)  Mother contends further that the juvenile court failed to discharge its duty to instruct the parties at their first appearance "to inform

13

the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).) DCFS concedes, and we agree, that DCFS and the court failed to discharge their respective initial inquiry duties. We conclude, however, that no prejudice resulted from the errors.

Although California law on the issue is unsettled,[7] this division consistently has rejected the argument that DCFS's failure to inquire of extended family members mandates automatic reversal. (See *In re S.S.* (2022) 75 Cal.App.5th 575, 581 (*S.S.*); *In re Darian R.* (2022) 75 Cal.App.5th 502, 504 (*Darian R.*); *In re A.C.* (2022) 75 Cal.App.5th 1009, 1017 (*A.C.*).) Rather, our division generally has evaluated this issue to determine whether " 'the probability of obtaining meaningful information is reasonable in the context of ICWA.' " (*Darian R.*, *supra*, at p. 509, quoting *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744.) In making this determination, we have rejected "a wooden approach to prejudice" (*A.C.*, *supra*, at p. 1017), and refused to require further inquiry when, based upon the particular circumstances revealed by the record, it is apparent "that additional information would not have been meaningful to the inquiry." (*Benjamin M.*, *supra*, at p. 743; see, e.g., *S.S.*, *supra*, at p. 582.)

Here, the record does not support that interviews of available extended family members would yield new information likely to bear on the ICWA inquiry. In addition to reflecting the parents'

---

[7] "[T]here is currently a wide and varied split of authority among the Courts of Appeal regarding the proper standard to apply in determining the prejudicial effect" of ICWA error. (*In re Y.M.* (2022) 82 Cal.App.5th 901, 911 (*Y.M.*).) The question of the applicable standard presently is pending before the California Supreme Court. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578.)

repeated denials of Indian heritage, the record discloses that both parents remained in close contact with biological extended family members. At various stages in the dependency proceedings, Mother lived with her own mother, and Mother maintained a relationship with her siblings. Similarly, Father lived with his parents and one sibling, and also maintained a relationship with his other siblings. Mother and Father "therefore presumably could have asked [their extended family members] at any time whether [they] knew of any possible Indian ancestry"—a fact that suggests that DCFS interviews of extended family members would be unlikely to produce new information meaningful to the ICWA inquiry. (*Y.M.*, *supra*, 82 Cal.App.5th at p. 917; accord, *Darian R.*, *supra*, 75 Cal.App.5th at p. 510 [initial inquiry error harmless where, among other factors, "[the] mother at various times lived with the relatives she claims DCFS failed to interview"].)

Moreover, paternal grandmother and paternal great-grandmother sought—and eventually obtained—legal guardianship of L.L. ICWA directs that "preference shall be given . . . to a placement with [¶] . . . [¶] . . . a member of the Indian child's extended family." (25 U.S.C. § 1915, subds. (a) & (b)(i).) Paternal grandmother and paternal great-grandmother thus "presumably would have had a strong incentive to raise any Indian ancestry in support of th[eir legal guardianship] goal," yet they did not do so. (*Y.M.*, *supra*, 82 Cal.App.5th at pp. 917–918; accord, *S.S.*, *supra*, 75 Cal.App.5th at p. 582.) We therefore conclude that DCFS's inquiry error did not result in prejudice.

Nor was the juvenile court's ICWA inquiry error prejudicial. The court did not advise the parents during their first appearance of the duty to disclose any newly acquired ICWA information; however, the court did confirm the parents' denials of Indian heritage on the record and subsequently issued a written order

15

directing the parents to provide any updated ICWA information to their attorneys, the court, and DCFS. Court-appointed counsel represented the parents throughout the dependency proceedings, and nothing in the record suggests any reason to doubt that the parents' attorneys would have been aware of, and ensured their clients' compliance with, the order. (See *In re Daniel S.* (2004) 115 Cal.App.4th 903, 915 ["in the absence of any evidence in the record to the contrary, we assume the attorney discharged his duty and spoke with [his client]," citing Evid. Code, § 664].)

We therefore conclude that the ICWA inquiry errors here were harmless.

### C. *Mother's Challenge to the March 22, 2022 Orders— Which Depends Entirely on Her Other Claims— Also Fails*

In seeking reversal of the juvenile court's March 22, 2022 orders, Mother relies exclusively on her arguments that (1) the court erred in summarily denying her section 388 petition, and (2) DCFS and the court each committed ICWA error. Because we conclude that neither of the aforementioned errors is reversible, we necessarily conclude that Mother's challenge to the March 22 orders also fails.

## DISPOSITION

The juvenile court's January 18, 2022 and March 22, 2022 orders are affirmed.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



WEINGART, J.

17